MGD

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DaJuan Torrell Williams,<br><br>Plaintiff,<br><br>v.<br><br>Charles L. Ryan, et al.,<br><br>Defendants. | No. CV 17-01833-PHX-DGC (CDB)<br><br>**ORDER** |

Plaintiff DaJuan Torrell Williams, currently confined in Arizona State Prison Complex-Eyman, brought this civil rights action under 42 U.S.C. § 1983. (Doc. 15.) Defendants move for summary judgment, and Plaintiff opposes. (Docs. 65, 86.) For the following reasons, the Court will grant the motion in part and call for additional briefing.[1]

**I.      Background.**

On screening of Plaintiff's First Amended Complaint pursuant to 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated First Amendment claims against Arizona Department of Corrections (ADC) Director Charles L. Ryan and Correctional Officers Barnes, Anderson, Osler, Mangan, Williams, and Antolin. (Doc. 17 at 9.) The Court required Defendant Ryan to answer Counts One and Two, and required Defendants

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response. (Doc. 66.)

Barnes, Anderson, Osler, Mangan, Williams, and Antolin to answer Counts Three through Seven. (*Id*. at 11.) The Court dismissed Count Eight. (*Id*. at 11.)[2]

Plaintiff's claims relate to ADC's Department Order (DO) 914.07, which prohibits prisoners from sending, receiving, or possessing "sexually explicit material or content that is detrimental to the safe, secure, and orderly operation of the facility." (Doc. 15 at 5.) Plaintiff alleges that even though he is a general population (GP) prisoner and not a sex offender, DO 914.07 applies to him, and that before Defendant Ryan became the ADC Director, prisoners were allowed to have non-obscene sexually explicit material. (*Id*. at 6-8.) Plaintiff seeks damages and injunctive relief. (Doc. 15-1 at 14.)

## II. Summary Judgment Standard.

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material (a fact that might affect the outcome of the suit under the governing law) and that the dispute is genuine (the evidence is such that a reasonable jury could return a verdict for the nonmovant). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). But it must "come forward

---

[2] The Court also determined that Plaintiff stated a claim against Defendant Doe 2 and gave Plaintiff 60 days to substitute the actual name. (*Id.* at 9-11.) Doe 2 was dismissed on June 18, 2018. (*See* Doc. 33.)

with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

The Court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The Court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The Court is required to consider only the cited materials, but may choose to consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III. Facts.**

**A. The Policy.**

Defendants assert that prior to 2010, ADC allowed prisoners to receive any type of sexually related photographs, magazines and writings, including those depicting nudity, as long as they did not depict or disrespect people in uniform. (Doc. 62 (Defs.' Statement of Facts) ¶ 6.) Plaintiff disputes that inmates were allowed to receive "virtually" any "pornography/sexually explicit material," and asserts that the pre-2010 policy only allowed prisoners to receive and possess "non-obscene" pornography and sexually explicit materials, and that publications depicting coercion, rape, sexual violence, sado-masochism, bondage, incest, and bestiality were not allowed. (Doc. 87 at 3 ¶ 6.)

While the pre-2010 policy was in effect, ADC administrators received consistent complaints from prison employees that the prisoners' use of sexually explicit material created a hostile work environment for staff and volunteers because prisoners were frequently harassing primarily female staff members and volunteers with the sexually explicit materials they possessed. (Doc. 62 ¶¶ 7-9.) Plaintiff disputes that there was ever a problem or "significant issue" of GP inmates harassing females, staff, or each other because "GP inmates do not tolerate any type of sexual offenses or violations," which is why sex offenders are not a part of the GP.[3] (Doc. 87 ¶ 8.)

---

[3] Plaintiff argues that Defendants have not sufficiently supported their facts by showing that any female staff have felt threatened or reasonably apprehensive about any

According to Defendants, the presence of sexually explicit pictures and text in the prison negatively impacted rehabilitation and treatment because the content encouraged general disrespect, especially towards females.[4] (Doc. 62 ¶ 10.) Based on the experience of ADC administrators and staff, ADC concluded that the presence of sexually explicit photographs and text in the prison was detrimental to staff safety and the orderly operation of the prison, and began in 2010 to regulate sexually explicit material entering the prison. (*Id.* ¶ 12.) After the adoption of those regulations, staff reported that they generally felt more comfortable because they were not exposed to unwanted images and text with graphic sexual content.[5] (*Id.* ¶ 14.)

ADC DO 914 sets forth the procedure for receipt, screening, and delivery of mail at the facility. (*Id.* ¶ 16.) DO 914.07 is titled "Unauthorized Content" and provides:

> In order to assist with rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile environment for inmates, staff and volunteers, inmates are not permitted to

---

sexual harassment. (Doc. 87 ¶ 8.) Plaintiff argues that any such incidents would be the subject of incident reports and other documentation, and he asks the Court to order Defendants to produce the records and documents of each incident on a GP unit. (*Id.*) The Court will deny this request. Plaintiff does not contend that he sought such discovery, raised any discovery dispute with the Court, or that the opportunity to do so was unavailable. Plaintiff previously sought statistics from ADC and other state agencies about sexually related disciplinary violations of GP inmates from 2004 to 2010, and the Court found that Plaintiff's request exceeded the proportional scope of discovery in this case and was not sufficiently probative on any issue. (Doc. 96 at 3, citing *Mauro*, 188 F.3d at 1060 ("prison officials need not prove that the banned material actually caused problems in the past, or that the materials are 'likely' to cause problems in the future")).

[4] Defendants support this fact with the Declaration of Carson McWilliams, the current Division Director of Offender Operations, whom Plaintiff argues is "not the moral police nor qualified to determine society's norms and/or presented no material fact to suggest otherwise." (Doc. 87 ¶ 10.) To the extent Plaintiff objects that Defendants' statement lacks foundation or support, the objection is overruled.

[5] Plaintiff disputes this statement as "unlikely and unsupported" and asserts that his conversations with actual staff members have been different and that ADC is punishing inmates "because some Mormons and Christians got upset because [inmates] were allowed to have porn." (Doc. 87 ¶ 14.) To the extent Plaintiff objects to this fact, the objection is overruled.

> send, receive or possess sexually explicit material or content that is detrimental to the safe, secure, and orderly operation of the facility as set forth in this Department Order.[6]

(DO 914.07 § 1.1 (Doc. 62-1 at 28).) Relevant to this action, prohibited publications include:

> [c]ontent in publications, photographs, drawings, or in any type of image or text that may, could reasonably be anticipated to, could reasonably result in, is or appears to be intended to cause or encourage sexual excitement or arousal or hostile behaviors, or that depicts sexually suggestive settings, poses or attire, and/or depicts sexual representations of inmates, correctional personnel, law enforcement, military, medical/mental health staff, programming staff, teachers or clergy.

(DO 914.07 § 1.2.17 (Doc. 62-1 at 29).) These include publications depicting nudity of either gender; contact with another person's unclothed genitals, pubic area, buttocks, or female breast; sadomasochistic abuse, sexual intercourse, masturbation, or incest; or sexual activity with an unwilling participant or child. (DO 914.07 §§ 1.2-1.2.2.6 (Doc. 62-1 at 28).) Defendants assert that DO 914 "does not prohibit any and all sexually related material in publications, but only sexually explicit material." (Doc. 62 ¶ 37.) Plaintiff disputes this fact, asserting that "sexually related" and "sexually explicit" are interchangeable terms and that "anything involving a female, under current policies, is prohibited." (Doc. 87 ¶ 37.)

Plaintiff asserts in his Declaration that in 2010, Defendant Ryan issued DO 914.07, "Sexually Explicit Material," which focused on "removing and banning pornography from the prisons," but allowed men's magazines and non-nude photos of women in lingerie. (Doc. 87 at 23-24 ¶ 36.) Plaintiff states that by 2014 the focus shifted "because all of the pornography had been purged from the prisons," and by 2016 "any and everything related to sex or anything sexual, real or imagined, was being excluded – men's magazines and non-nude photos, non-pornographic books [and] novels, legal and religious text and, even

---

[6] Defendants provide and cite to the April 7, 2017 version of DO 914 (Doc. 62-1 at 14-36) even though some of the publications Plaintiff says he was denied likely were excluded under earlier versions of DO 914.

- 5 -

fashion and gossip magazines, etc." (*Id*. at 24 ¶ 37.) Under the 2016 revision of DO 914.07, the title was changed from "Sexually Explicit Material" to "Unauthorized Content," which Plaintiff asserts "allows for the prison [to] exclude every publication." (*Id*. ¶ 38.)

### B. Application of the Policy Generally.

ADC staff pick up ADC mail from the post office and process the mail at each prison complex. (Doc. 62 ¶ 16.) Because of the volume of magazines and publications received by prisoners, it is not possible for one person to review all the material to determine if it meets regulations. (*Id*. ¶ 21.) Each complex accordingly designates staff to review incoming magazines and publications, and staff are periodically trained on what to look for in reviewing these materials. (*Id*.) The Office of Publication Review (OPR) is consulted by publication review staff about publication decisions, and the OPR manages the publication review database, which is a statewide database containing information about all publications allowed or rejected by mailroom staff.[7] (*Id*. ¶ 23.) Prisoners have 30 days to appeal to the OPR any decision to withhold a publication for having sexually explicit material. (*Id*. ¶ 29.)

Prisoners at all custody levels have access to fiction, non-fiction, newspapers, magazines and general reference materials located in their complex's Resource Center/Library. (*Id*. ¶ 33.) Some books within the prison libraries may contain sexually explicit content because books are not part of the publication review under DO 914. But books with an obviously sexually explicit orientation may be excluded under DO 914. (*Id*. ¶ 34.) Depending on their custody level, prisoners have access to commercial television programming, including sexually related content, and ADC does not monitor or regulate the programming available to prisoners on those channels.[8] (*Id*. ¶ 35.)

---

[7] Plaintiff disputes this fact and states that he "was denied access to or material evidence of the stated fact," but he fails to state what he requested, when, or from whom.

[8] Plaintiff disputes this fact, asserting that he has no control over the content of broadcast television and that he cannot watch what interests him. (Doc. 87 ¶ 35.)

C.   **The Policy as Applied to Plaintiff's Publications and Photographs.**

Defendants reviewed the Publication Review Database (PRD) to determine which of Plaintiff's publications were excluded, and located the following: on July 11, 2012, "Florence" excluded *Pleasure Control*; on April 30, 2014, C. Antolin excluded *Seduction's Spell*; and on January 1, 2016, E. Franco excluded *Decadence*. (*Id.* ¶¶ 48-49.) Defendants also searched the PRD's "miscellaneous file" and located an appeal decision upholding the exclusion of two publications printed from the internet titled *XXX Adult Stories; Burning Desires* and *XXX Adult Stories: A Bride for the Whole Family*, which Plaintiff says were seized by Defendants Osler and Mangan. (*Id.* ¶¶ 50-51; Doc. 87 at 13 ¶¶ 55-56.)

In addition to those publications, Plaintiff submits evidence that Defendant Barnes withheld his publication, *The Forever Kiss*. (Doc. 87 at 12 ¶ 49.) He also presents evidence that Defendant Williams excluded a non-nude photograph catalog; that Defendant Mangan, seized, excluded, or redacted Plaintiff's November 2016 issue of *Cosmopolitan*, his January 2017 issue of *Elle*, his March 2017 issue of *Harper's Bazaar*, a non-nude photographs catalog, and other non-nude photographs; and that Defendant Antolin seized, excluded, or redacted Plaintiff's October 2014 issue of *Prison Legal News*. (Doc. 87 at 13 ¶¶ 57-62 and Doc. 87-3 at 9-11.)

**IV.   Discussion.**

Defendants argue that ADC's publication policy is facially constitutional, they are entitled to qualified immunity, and if they are not entitled to qualified immunity, Plaintiff's as-applied challenges fail. (Doc. 65.)

A.   **First Amendment Standard.**

Prisoners enjoy a First Amendment right to send and receive mail. *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995). But their First Amendment rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987). A regulation that impinges on an inmate's First Amendment rights is valid if it "is reasonably related to legitimate penological interests." *Frost v. Symington*, 197

F.3d 348, 354 (9th Cir. 1999) (citing *Turner v. Safley*, 482 U.S. 78 (1987)). Prison security and rehabilitation are legitimate penological interests. *Turner*, 482 U.S. 78, 89 (1987) (prison security); *Pell v. Procunier*, 417 U.S. 817, 823 (1974) (rehabilitation); *see also O'Keefe v. Van Boening*, 82 F.3d 322, 326 (9th Cir. 1996) (deterring criminal activity and maintaining prisoner security are legitimate penological interests justifying regulations on prisoner mail).

To determine the validity of a prison regulation, courts apply the test established in the Supreme Court's *Turner* decision, which considers four factors: (1) whether there is a valid, rational connection between the regulation and the legitimate governmental interest the regulation is designed to protect; (2) whether the prisoner has alternative means of exercising the right at issue; (3) the impact any accommodation would have on guards, other inmates, and allocation of prison resources; and (4) whether there are "ready alternatives" for furthering the government interest, which would suggest that the regulation is an exaggerated response to the jail's concern. *Turner*, 482 U.S. at 89-90. On the other hand, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.* at 90. The Supreme Court recognizes that there are greater security concerns for incoming mail than for outgoing mail. *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989).

*Turner* is a deferential standard. Courts must give "substantial deference to the professional judgment of prison administrators." *Beard v. Bank*, 548 U.S. 521, 528 (2006) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)). A court need not agree with the officials' proffered legitimate penological interest. *Frost*, 197 F.3d at 355. The inquiry is not whether the policy actually serves a penological interest, but whether jail officials rationally believe that it would. *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999) ("prison officials need not prove that the banned material actually caused problems in the past, or that the materials are 'likely' to cause problems in the future") (quoting *Thornburgh*, 490 U.S. at 417).

/ / /

**B.     Plaintiff's Facial Challenge (*Turner* analysis).**

**1.     Rational Connection to Legitimate Governmental Interest.**

First, the Court must determine whether the governmental objective underlying DO 904.17's exclusion of sexually explicit material or content is (a) legitimate, (b) neutral, and (c) rationally related to that objective. *Thornburgh*, 490 U.S. at 414. "In the prison context, regulations that apply to specific types of content due to specific inherent risks or harms are considered to be content neutral." *Bahrampour v. Lampert*, 356 F.3d 969, 975 (9th Cir. 2004). In *Thornburgh*, the Supreme Court explained:

> [P]rison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison. Acknowledging the expertise of these officials and that the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world.

*Thornburgh*, 490 U.S. at 408 (citation omitted).

The stated purpose of DO 914.07 is to "assist with rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile environment for inmates, staff and volunteers." (Doc. 62-1 at 28.) Defendants cite evidence that the presence of sexually explicit material encouraged general disrespect, primarily of female employees and volunteers, and was detrimental to staff safety and the orderly operation of the prisons. (Doc. 62 ¶¶ 7-9.) These are legitimate penological interests. *See Mauro*, 188 F.3d at 1059 (stating that "maintaining jail security, rehabilitating inmates and reducing sexual harassment of female detention officers. . . [are] beyond question . . . legitimate penological interests"); *see also Davis v. Penzone*, No. CV 17-01946-PHX-SMB, 2019 WL 911967, at *5 (D. Ariz. Feb. 25, 2019) ("legitimate penological objectives [include] maintaining security and the good order of the facility, ensuring an environment free of sexual

1 harassment, and preventing publications that could be detrimental to jail safety from
2 entering the facility").

3 The policy is neutral on its face. Plaintiff cites no evidence indicating that the aim
4 of the policy is to suppress expression. *See Thornburgh*, 490 U.S. at 415-16; *see also*
5 *Mauro*, 188 F.3d at 1059 (regulations neutral where "the jail administrators drew a
6 distinction between materials solely on the basis of the materials' potential effect on the
7 prison's legitimate objectives").

8 "To show a rational relationship between a regulation and a legitimate penological
9 interest, [Defendants] need not prove that the banned material actually caused problems in
10 the past, or that the materials are 'likely' to cause problems in the future." *Mauro*, 188
11 F.3d at 1060 (citation omitted). If prison administrators "might reasonably have thought
12 that the policy would advance [prison] interests[,]" the *Turner* standard is met. *Id.* The
13 rational relationship between DO 914.07 and the objectives sought to be addressed by the
14 policy, including rehabilitation, treatment, security, and the avoidance of sexual
15 harassment, is clearly "not so 'remote as to render the policy arbitrary or irrational.'"
16 *Mauro*, 188 F.3d at 1060 (citing *Turner*, 482 U.S. at 89-90) (other citations omitted). The
17 prison's stated goals are reasonably related to prohibiting material from entering the prison
18 population which may incite or contribute to sexual harassment and a hostile environment
19 for inmates, guards, and volunteers, and impede rehabilitation and treatment objectives.

20 Plaintiff does not meaningfully refute Defendants' evidence or arguments. He
21 presents his and two other prisoners' affidavits which state that ADC's GP prisoners do
22 not rape, sexually harass, or engage in non-consensual acts of a sexual nature towards
23 female staff or others, and that there is "zero tolerance" for such behavior among the GP
24 prisoners. (*See* Doc. 87 at 20-21 ¶¶ 13-19 (Pla. Decl.); Doc. 87-2 at 16 ¶¶ 10-11 (Moore
25 Decl.); Doc. 87-2 at 21 ¶ 55 (Garcia Decl.).) Plaintiff and the two prisoners also state that
26 ADC provides little in the way of rehabilitation and treatment programming. (*See* Doc. 87
27 at 21 ¶ 20; Doc. 87-2 at 17 ¶ 16; Doc. 87-2 at 23 ¶ 7.) In addition to the fact that these
28 affidavits do not necessarily reflect the attitudes or behaviors of all GP inmates now or in

the past, they address the wrong test. As noted above, Defendants are not required to show that banned materials actually caused problems in the past or are likely to cause future problems. *See Mauro*, 188 F.3d at 1060. "The only question that we must answer is whether the defendants' judgment was 'rational,' that is, whether the defendants might reasonably have thought that the policy would advance its interests." *Id.* This test clearly is satisfied. "The relationship between the possession of sexually explicit materials and the problems sought to be addressed by the policy – sexual harassment of female officers, jail security and rehabilitation of inmates – is clear." *Id*. This factor weighs in Defendants' favor.

### 2. Alternative Means of Exercising Right at Issue.

The second *Turner* factor considers "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." *Id*. (internal quotations and citations omitted).

To address this factor, the Court must first identify the "right" at issue in this case. The Supreme Court has instructed that the right in question "must be viewed sensibly and expansively." *Thornburgh*, 490 U.S. at 417. As part of this explanation, the Supreme Court cited two examples. First, it noted that the "right" at issue in *Turner*, a case concerning correspondence with fellow prisoners, was not the right to communicate with other prisoners, but the right to communicate with others more generally. *Id.* As *Turner* explained: "the correspondence regulation does not deprive prisoners of all means of expression. Rather, it bars communication only with a limited class of other people with whom prison officials have particular cause to be concerned – inmates at other institutions within the Missouri prison system." 482 U.S. at 92.

Second, the Supreme Court noted that in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), a case concerning participation in the Muslim Jumu'ah religious ceremony, the

Court did not view the "right" at issue as the right to attend that specific ceremony. *Thornburgh*, 490 U.S. at 417. Instead, *O'Lone* provided this explanation: "In *Turner*, we did not look to see whether prisoners had other means of communicating with fellow inmates, but instead examined whether the inmates were deprived of 'all means of expression.' Here, similarly, we think it appropriate to see whether under these regulations respondents retain the ability to participate in other Muslim religious ceremonies." 482 U.S. at 352 (citation omitted).

Applying this guidance, the Court concludes that the "right" at issue in this case is the right of inmates to receive publications and correspondence from the outside. This is a sensible and, particularly, an expansive definition of the right, as instructed by the Supreme Court in *Thornburgh*, *O'Lone*, *and Turner*.[9] Defendants present evidence that ADC prisoners have alternatives to receive many kinds of publication and correspondence from the outside, including sexual content such as other reading materials, library books that may have sexual content, and television programs that have sexual content. (Doc. 62 ¶¶ 32-35.) Thus, "the regulations permit a broad range of publications to be sent, received, and read," showing that there are alternative avenues for inmates to exercise their right to receive materials from the outside. *Thornburgh*, 490 U.S. at 417-18; *see also Mauro*, 188 F.3d at 1061.

Plaintiff argues that allowing the prison to exclude all of his books and give him the Book of Mormon or Bible "is a flawed legal principle," renders the First Amendment "powerless," and allows the government to "supplement their own agenda or propaganda." (Doc. 86 at 4.) But Plaintiff does not dispute Defendants' evidence that other materials are available to him, including materials with sexual content. The second *Turner* factor weighs in Defendants' favor.

///

---

[9] The Court recognizes that the Ninth Circuit in *Mauro* defined the right at issue as the right to receive sexually explicit material. *See Mauro*, 188 F.3d at 1061. But in doing so, the Court of Appeals adopted the district court's definition without explaining why it was appropriate. *Id.* The Court views this as a case-specific definition of the right, and not generally as the expansive definition required by the Supreme Court.

### 3. Adverse Impacts of Accommodation.

The Court must next consider the impact on the prison and other inmates if prisoners were allowed to receive publications that contain sexually explicit content. *Turner*, 482 U.S. at 90. "If accommodations for a constitutional right would cause significant changes within the prison environment, the courts should give deference to the prison officials who are responsible for safe, effective, and efficient administration of the prison system." *Bahrampour*, 356 F.3d at 975. Plaintiff bears the burden of refuting the prison officials' claims that the accommodation would cause such significant changes. *See Frost*, 197 F.3d at 359; *see also Davis*, 2019 WL 911967, at *6 (citing *Frost* as "applying the same burden-shifting standard set forth under the first prong's common-sense analysis to the third prong analysis"); *Alexander v. Cal. Dep't of Corrections*, No. 2:08-cv-2773 MCE KJN, 2012 WL 439498, at *13 (E.D. Cal. Feb. 9, 2012) (plaintiff's burden, citing *Frost*).

Defendants cite evidence that allowing prisoners access to the prohibited material has led to harassment of prison staff and visitors and created a hostile work environment. Plaintiff argues that allowing "pornography [and] sexually explicit material back into the general population would have little or no effect on ADC," but cites no support. (Doc. 86 at 4.) He therefore "has not met his burden of refuting the prison's claim that allowing inmates to have unrestricted access to materials depicting [the prohibited content] would threaten the security of inmates and of guards [and visitors] who might be subjected to sexual harassment [and a hostile environment] as a result." *See Frost*, 197 F.3d at 358; *Davis*, 2019 WL 911967, at *6; *Alexander*, 2012 WL 439498, at *13.

The Supreme Court has recognized that "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90. Given this deference, and "[a]bsent controverting evidence from Plaintiff, the asserted 'ripple effect' here of disrupting jail security and safety is sufficient to tip the third factor in Defendant[s'] favor." *Davis*, 2019 WL 911967, at *6 (quoting *Turner*, 482 U.S. at 90); *see also Covell v. Arpaio*, 662 F. Supp. 2d 1146, 1154 (D. Ariz. 2009).

#### 4. Obvious Alternatives.

Finally, the Court examines whether the policy at issue is an exaggerated response to the prison's concerns. *Turner*, 482 U.S. at 90. Plaintiff bears the burden of showing that there are obvious alternatives to the regulation. *See Mauro*, 188 F.3d at 1062; *Covell*, 662 F. Supp. 2d at 1154-55. If the plaintiff can identify an alternative that fully accommodates the right at a de minimis cost to valid penological goals, the policy may be viewed as an exaggerated response. *Turner*, 482 U.S. at 90-91. "If there are no obvious alternatives, and if the inmate only presents solutions that will negatively impact valid penological interests, then courts will view the absence of ready alternatives as evidence of a reasonable regulation." *Bahrampour*, 356 F.3d at 976.

Plaintiff makes no argument as to this fourth factor, but simply "asserts all points and arguments herein stated." (Doc. 86 at 4.) Presumably, Plaintiff wants access to all materials he had prior to the current version of DO 914.07, or possibly prior to 2010, although it is not clear. Plaintiff has failed to meet his burden of showing that there are obvious alternatives at a de minimis cost to the valid penological goals advanced by DO 914.07. This factor therefore weighs in Defendants' favor.

All four *Turner* factors weigh in Defendants' favor. Plaintiff has failed to establish a genuine issue of material fact about whether DO 914.07 violates his First Amendment rights. Defendants are therefore entitled to summary judgment on this claim.

#### 5. Recent Decision in *Prison Legal News v. Ryan*.

The Court is aware that a respected judge in this district recently held DO 914.07 facially unconstitutional. *See Prison Legal News v. Ryan*, No. CV 15-02245-PHX-ROS, 2019 WL 1099882, \*10 (D. Ariz. Mar. 8, 2019). That case, brought by an outside publisher, concluded that the regulation was overbroad in two respects and therefore lacked a rational connection to a legitimate government interest under the first *Turner* factor. *Id.* The case asserted that "[o]verbreadth can 'cast doubt upon the purported legitimate interest at stake,'" citing authority from Delaware and Virginia district courts. *Id.* The case quoted ADC's definition for "sexually explicit material," which means "any publication that

1 pictorially or textually depicts nudity of either gender, or homosexual, heterosexual, or auto-erotic sex acts," and concluded that the definition effectively reads "explicit" out of the definition and includes all sexually related material. *Id.* The case also found overbreadth in the policy's prohibition on content that "may, could reasonably be anticipated to, could reasonably result in, is or appears to be intended to cause or encourage sexual excitement or arousal." *Id.*

This Court is not persuaded that overbreadth provides a basis for finding the ADC regulation facially unconstitutional. In the Ninth Circuit's decision in *Bahrampour*, an inmate plaintiff challenged a similar policy that prohibited sexually explicit material. 356 F.3d at 973-74. The plaintiff argued that "claims of vagueness and over-breadth must be considered separately from the requirement that prison regulations must be 'reasonably related to legitimate penological interests'" under the first *Turner* factor. *Id.* at 975. The Ninth Circuit declined to conduct a separate overbreadth analysis. *See id.* at 975-76. Instead, the Court of Appeals repeated that "[w]hen a prison regulation *impinges on inmates' constitutional rights*, the regulation *is valid* if it is reasonably related to legitimate penological interests." *Id.* at 973 (quoting *Turner*, 482 U.S. at 89) (emphasis added). This deferential standard, the Ninth Circuit stated, "is necessary if 'prison administrators . . . , and not the courts [are] to make the difficult judgments concerning institutional operations.'" *Id.* (quoting *Turner*, 482 U.S. at 89). "State prison officials are [to be] given deference in day-to-day prison operations due to separation of powers and federalism concerns." *Id.* (citing *Turner*, 482 U.S. at 84-85).

Thus, the four-factor *Turner* analysis accounts for vagueness and overbreadth concerns. To "defeat summary judgment, [a plaintiff] must demonstrate that the regulations are not reasonably related to legitimate penological interests." *Id.* If the regulations are reasonably related to legitimate penological goals, then a prison regulation is valid even if it impinges on an inmate's constitutional rights. *Id.* (citing *Turner*, 482 U.S. at 89).

Under the first *Turner* factor, if a prison policy is legitimate and neutral, "[t]he only question that we must answer is whether the defendants' judgment was 'rational,' that is, whether the defendants might reasonably have thought that the policy would advance its interests." *Mauro*, 188 F.3d at 1060. As discussed above, the Court answers that question in the affirmative as to DO 914.07. Given the minimal burden Defendants have under *Turner*, the deference the Court is to give prison authorities in regulating their institutions, and the lack of binding authority to the contrary, the Court will conduct no additional overbreadth analysis to cast doubt on the legitimate interests at stake. *See Thornburgh*, 490 U.S. at 416 & n.15 ("Where the regulations at issue concern the entry of materials into the prison, we agree with the District Court that a regulation which gives prison authorities broad discretion is appropriate. . . . The exercise of discretion called for by these regulations may produce seeming 'inconsistencies,' but what may appear to be inconsistent results are not necessarily signs of arbitrariness or irrationality."); *Gronquist v. Cunningham*, 747 F. App'd 532, 533-34 (9th Cir. 2018) (citing *Bahrampour* and stating that "*Turner* analysis applies to facial overbreadth and vagueness challenges to regulation of prison mail, in addition to as-applied challenges"); *Chavez v. Lewis*, No. C-11-0376 EMC, 2012 WL 2906134, at *9 (N.D. Cal. July 13, 2012) (citing *Bahrampour* as "applying *Turner* test despite inmate's assertion that vagueness and overbreadth claims must be considered separate and apart from application of *Turner* test"); *Martinez v. Fischer*, CIV S-10-0366 GGH P, 2011 WL 4543191, at *6 (E.D. Cal. Sept. 28, 2011) (same).

C. **Plaintiff's As-Applied Challenge Seeking Damages.**

Plaintiff brings this action against Defendants in their individual capacities for damages based on the exclusion of his ordered publications. The Court assumes, therefore, that Plaintiff asserts a First Amendment as-applied challenge based on that exclusion.

1. **Qualified Immunity.**

In order to prove an individual capacity claim against a policy maker, Plaintiff must produce evidence showing that a defendant: (1) promulgated, implemented, or otherwise possessed responsibility for the continued operation of the unconstitutional policy, and

(2) that the constitutional violation occurred pursuant to that policy. *See OSU Alliance v. Ray*, 699 F. 3d 1053, 1076 (9th Cir. 2012) ("advancing a policy that requires subordinates to commit constitutional violations is always enough for § 1983 liability . . . so long as the policy proximately causes the harm – that is, so long as the plaintiff's constitutional injury in fact occurs pursuant to the policy."). Government officials are entitled to qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding whether qualified immunity applies, a court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address either prong first depending on the circumstances in the particular case).

For a right to be clearly established, there need not be a case directly on point, but "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2017)). Clearly established law "must be particularized to the facts of the case," and "should not be defined at a high level of generality." *White*, 137 S. Ct. at 552 (quotation and citation omitted). A right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 137 S. Ct. at 551). Once the right at issue is defined, the court must then "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated" that right. *Id.* If there is no such case, then the right was not clearly established. *See id.* at 1117-18. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations omitted).

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation omitted). The purpose of qualified immunity is "to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).

### 2. Analysis.

As discussed, Plaintiff has failed to demonstrate that material issues of fact exist as to DO 914.07's facial constitutionality. But even if DO 914.07 were facially unconstitutional, Defendant Ryan and the officers who allegedly excluded Plaintiff's publications would nonetheless be entitled to qualified immunity as to Plaintiff's as-applied claims for damages.

No question exists that prison administrators may enact policies for the safety and security of the institution, including policies regulating an inmate's receipt and possession of sexually explicit materials. *See, e.g.*, *Thornburgh*, 490 U.S. at 405 (finding regulation that allowed warden to reject a publication if it was "determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity" was reasonably related to legitimate penological interests); *Mauro*, 188 F.3d at 1057 (upholding jail's policy that prohibited "sexually explicit materials," where "sexually explicit materials" were defined as "materials that show frontal nudity," including "personal photographs, drawings, and magazines and pictorials that show frontal nudity").

Other than the decision in *Prison Legal News*, the Court is unaware of any cases in this circuit holding that a policy like the one at issue in this action was unconstitutional. Indeed, in *Thornburgh*, the Supreme Court noted that "[t]he exercise of discretion called for by these regulations may produce seeming 'inconsistencies,' but what may appear to be inconsistent results are not necessarily signs of arbitrariness or irrationality." 490 U.S.

at 417. The Supreme Court explained that given the variability within institutions over time, "greater consistency might be attainable only at the cost of a more broadly restrictive rule against admission of incoming publications." *Id.*

In light of preexisting law, it was reasonable for Defendant Ryan to believe that instituting the ADC policy at issue was lawful, and that the discretion given to publication officers in implementing the policy was reasonably related to a legitimate government interest. *Cf. Crofton v. Roe*, 170 F.3d 957, 961 (9th Cir. 1999) (delay in delivery of publications does not violate First Amendment rights if the delay is reasonably related to a legitimate penological interest); *Sorrels*, 290 F.3d at 971 (prison officials were entitled to qualified immunity in enforcing policy that prohibited gift publications that prisoners did not purchase because there was no published caselaw on point and the policy "was not so far-fetched that its illegality was necessarily obvious to a reasonable prison official").

Given the lack of case law holding that a policy like DO 914.07 was unconstitutional, or that the officers' use of discretion in applying the policy was unconstitutional, the Court concludes that Defendants' are entitled to qualified immunity as to Plaintiff's as-applied claim for damages. The Court will grant summary judgment on this claim.

**D. As-Applied Challenge Seeking Injunctive Relief.**

Plaintiff appears to assert an as-applied challenge seeking injunctive relief, but the specific relief he seeks is unclear. *See* Doc. 15. Defendants' motion seeks summary judgment on all claims (*see* Doc. 65 at 27), but does not mention Plaintiff's as-applied claim for injunctive relief. To give the parties an opportunity to fully address this claim on summary judgment, the Court will order supplemental briefing on the following issues:

1. Plaintiff should identify and the parties should discuss the specific injunctive relief Plaintiff seeks, with reference to specific excluded or redacted materials.

2. The parties should identify each item, discuss the nature of the materials and how and when Plaintiff was deprived of that content, and Defendants should state the bases for the exclusions and justify those reasons under applicable law.

3. The parties should identify and discuss, as relevant, the absence or presence of any genuine disputes of material fact on Plaintiff's injunctive relief claims, including any other considerations or arguments relevant to Defendants' motion.

Plaintiff shall file a memorandum by **September 27, 2019**, addressing these points and explaining the specific injunctive relief he seeks. Defendants will file a response by **October 18, 2019**, stating the bases for their summary judgment motion as to these injunctive relief claims, and justifying the exclusion or redaction of materials that Plaintiff identifies as the bases for his claims. Plaintiff shall file a reply by **November 8, 2019**.

**IT IS ORDERED:**

1. The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 65).

2. Defendants' Motion for Summary Judgment (Doc. 65) is **granted in part**. Judgment is entered on Plaintiff's facial challenge and on his as-applied challenge seeking damages.

3. The parties are ordered to file the supplemental briefing explained above.

Dated this 29th day of August, 2019.

_David G. Campbell_
David G. Campbell
Senior United States District Judge